UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ANNA V. KASHPER, individually, and as mother ) and next friend of Three Minors and as personal) representative of the ESTATE OF KONSTANTIN ) M. KASHPER, ) | |
| Plaintiff, ) | C.A. No. 1:17-cv- 12462-WGY |
| VS. ) | |
| TOYOTA MOTOR SALES, U.S.A., INC.; ) TOYOTA MOTOR CORPORATION; ) ENTERPRISE FM TRUST; ENTERPRISE FLEET ) MANAGEMENT; JOHN DOE 1; JOHN DOE 2 ) and JOHN DOE 3, ) | |
| Defendants. ) | |

**TOYOTA MOTOR SALES, U.S.A., INC.'S WITH KASHPER PLAINTIFFS RESPONSES L.R. 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to L.R. 56.1 of the U.S. District Court for the District of Massachusetts, defends Toyota Motor Sales, U.S.A., Inc. ("TMS") hereby submits the following Statement of Undisputed Material Facts:

1. On January 26, 2017, Konstantin Kashper was driving a 2016 Toyota Tacoma pickup truck northbound on Interstate 495 in Milford, Massachusetts. Plaintiff's Complaint, 14—15 (attached as Exhibit 1).

**RESPONSE:** Deny as inadequate. The Toyota Tacoma was purchased new in late July-early August by Enterprise for purposes of leasing the Toyota Tacoma to Borrego Solar. Borrego solar the employer of Konstantin Kashper, then upon delivery gave possession and control to

Konstantin Kashper. Enterprise remained responsible for maintenance and repairs and claims that it did none prior to January 26, 2017. According to Anna Kashper, Konstantin's widow, and others Konstantin' was a fanatic about seatbelts, and always absolutely always belted himself when in a moving motor vehicle. The criteria for admissibility and reliance on habit evidence is met.

2. For unknown reasons, Mr. Kashper's Tacoma went off the roadway, traveled over an embankment, struck a rock formation, and did a half-roll before landing on its roof. Affidavit of Donald F. Tandy, Jr., Exhibit A, p. 2 (attached as Exhibit 2).

   **RESPONSE:** Deny, reasons include absence of collision avoidance and absence of automatic braking and other safety features that 2016 models of other manufacturers had, deny an embankment, not clear whether a half-roll or more before came to rest upside-down.

3. The speed limit on I-495 in the location of the accident is 65 miles per hour. Exhibit 2, Tandy Aff., Exhibit A, p. 24.

   **RESPONSE:** Neither admit nor deny, not relevant, as Toyota Tacoma clearly going less than speed limit.

4. Data recovered from the Tacoma's electronic data recorder ("EDR") demonstrates that approximately five seconds before striking the rock formation Mr. Kashper was traveling only 41 miles per hour. Deposition of Trooper Kiel Dzivasen, p. 114:17— 115:19 (cited pages attached as Exhibit 3).

   **RESPONSE:** Deny, that EDR data is reliable or valid.

5. The EDR data further demonstrates that for 4.6 seconds prior to the collision, Mr. Kashper did not depress the brake pedal or accelerator. Exhibit 2, Tandy Aff., Exhibit A, p. 3; Exhibit 3, Dzivasen Depo., p. 115:24—116:5.

**RESPONSE:** Deny, EDR data is neither reliable nor valid. GPS data has heavy braking.

First the EDR data directly contradicts other known data, some of which is significant including front airbag deployment, Kashper braking, speed of Toyota Tacoma at impact.

1) According to the narrative of the Milford Fire Department, who extracted Konstantin Kashper from the Toyota Tacoma the air bags deployed. Page one of Narrative for Lt. Michael Detore. Michael Detore deposition page 52 line 21. page 56, line 19 to page 57, line 3 multiple air bags deployed but does not remember which ones.

2) According to Officer McDonald the first identifiable person to view Konstantin Kashper the front airbag was deployed, deposition page 44 lines 11-22. page 68 line 19 to page 69, line 6.

3) GPS report. which is exhibit one Van Arsdell deposition, states on page 4: "4. 4:34 PM speed dropped to 16 MPH (GPS company reports it as "Harsh Breaking") then speed went to 4 MPH (possibly vehicle rolled after impact).

4) The EDR report upon which Toyota and/or its experts rely claim the front air bag did not deploy, that the speed at impact was about 31 mph and there was no breaking at all.

Second, not even Toyota claims the EDR data is sufficiently reliable and/or sufficiently valid.

Exhibits two through five from the Van Arsdell involve reports and information about this. Of special significance are two of these exhibits:

Exhibit two is a Washington Post article that quotes from Toyota's web site. "Toyota expressed doubts about its ability to accurately read the data from the recorders. The tool for recording the data has not been "scientifically validated," the company has said "At this time Toyota does not have confidence that the readout reports it generates are accurate," it added.

Exhibit three is from Toyota Data Recorder Manual and is headed 'Reliability Limitations: "The ECU memory was designed for the purpose of Toyota's internal research and development." Any information which may be contained in an ECU's memory regarding G wave data was not designed to be used as an accident reconstruction tool. Additionally, ECU memory of diagnostic codes was not designed as a means of determining the status or condition of the airbag system prior to an accident in which the airbags deployed. Data obtained during the readout of the ECU could be misleading if used for those purposes.

Accordingly, it is Toyota's policy to refuse requests to perform readouts of ECU memory. Similarly, Toyota does not rely on such data, nor had it ever relied on such data, in Analyzing collision events and/or airbag deployments which are the subject of a claim or Lawsuit."

6. After coasting at 41 miles per hour for 4.6 seconds, the truck crashed into the rock formation traveling between 27 and 34 miles per hour. Exhibit 2, Tandy Aff., Exhibit A, p. 3.
   **RESPONSE:** Deny, GPS data has different speed and has heavy braking and speed reduction during that time period.

7. Mr. Kashper did not attempt to steer the 2016 Tacoma from the time he left the paved

roadway to the time the Tacoma struck the rock formation. <u>Exhibit 3,</u> Dzivasen Depo., p.

93:9—94:2, 95: 1—11, 117:3—14.

**RESPONSE:** <u>Deny, NO evidence of what Mr. Kashper did on steering or whether steering</u>

<u>even operational.</u>

8. There is no evidence on the roadway that Mr. Kashper applied the brakes or took any evasive

action immediately prior to going off the paved roadway. <u>Exhibit 3,</u> Dzivasen Depo., p.

93:9—95:18.

**RESPONSE:** <u>Deny, GPS has heavy braking.</u>

9. After the crash, Mr. Kashper was found to be unresponsive by all on-scene observers. <u>Exhibit</u>

<u>3,</u> Dzivasen Depo., p. 64:1-6; Deposition of Sean M. Cavanaugh, p. 31:3-17 (cited pages

attached as <u>Exhibit 4</u>); Deposition of William T. Collins, p. 29:6-13, 39:5-19 (cited pages

attached as <u>Exhibit 5</u>); Deposition of Michael J. DeTore, p. 33: 13-34:1 (cited pages attached

as <u>Exhibit 6</u>); Deposition of Timothy J. Hunt, p. 53:9-17, 83:3-16 (cited pages attached as

<u>Exhibit 7</u>); Deposition of

Matthew Kelly, p. 39:8-15 (cited pages attached as <u>Exhibit 8</u>); Deposition of Stephen

McDonald, p. 39:13-16, 126:20-127:14 (cited pages attached as <u>Exhibit 9</u>).

10. Mr. Kashper was pronounced dead on January 29, 2017. <u>Exhibit 1,</u> **Plaintiff's** Complaint, 15.

**RESPONSE:** <u>Deny, Pronounced dead on January 26, 2017.</u>

11. There is no evidence as to what caused the 2016 Tacoma to leave the roadway prior to the

collision with the rock formation. Exhibit 2, Tandy Aff., Exhibit A, p. 3; Exhibit 3, Dzivasen Depo., p. 42:22- 43:10, 120:13-123:2.

**RESPONSE**: Deny, in that the absence of certain safety features that vehicles competitive with Tacoma had and that the Tacoma has now adopted as standard equipment would have prevented this. Not relevant to any issue in this motion.

12. The plaintiff alleged that the 2016 Tacoma was defective because it was subject to a recall concerning the possibility of a rear differential oil leak. Exhibit 1, **Plaintiff's** Complaint, 17.

13. The 2016 Tacoma did not have a rear differential oil leak. Exhibit 2, Tandy Aff., Exhibit A, p. 2-3.

**RESPONSE:** Deny, not known as Tacoma not in possession  or control of Kashper and no dismantling was possible.

**RESPONSE:** Deny, may be evidence, Plaintiff did not get possession of vehicle and did not take it apart.

14. The wheel speed data provided by the EDR confirm that the tires were rotating properly and there was no problem with the rear axle or differential at the time of the crash. Exhibit 2, Tandy Aff., Exhibit A, p. 2-3; Exhibit 3, Dzivasen Depo., p. 121:17-122:5.

**RESPONSE:** The EDR is neither valid nor reliable, see above.

15. The plaintiff alleged that the seatbelts were defectively designed and should have protected Mr. Kashper during the accident. Exhibit 1, Plaintiff's Complaint, 17.

**16.** The plaintiff also claimed that the driver's seatbelt was falsely latched at the time of **the** accident or experienced an inadvertent or inertial release during the rollover. Plaintiffs Answers to TMS's Interrogatories, Answer to Ints. 8 and 9 (attached as <u>Exhibit 10</u>).

**17.** Mr. Kashper was found at the scene not wearing a seatbelt. <u>Exhibit 3,</u> Dzivasen Depo., p. 60:8-61:9; <u>Exhibit 4,</u> Cavanaugh Depo., p. 23:13-24; <u>Exhibit 5,</u> Collins Depo., p. 29:1^20; <u>Exhibit 6,</u> DeTore Depo., p. 34:2—10; <u>Exhibit 9,</u> McDonald Depo., p. 45:1-7.

**18.** The driver's seatbelt was found tight against the 2016 Tacoma's B-pillar at the scene. <u>Exhibit 3</u>, Dzivasen Depo., p. 60:8-61:9; Affidavit of William W. Van Arsdell, Exhibit A, p. 6-7 (attached as <u>Exhibit 11</u>).
**RESPONSE:** <u>Deny, This is meaningless, sort of how high is high. Similarly, nothing scientific or meaningful by use of word tight.</u>

**19.** The 2016 Tacoma was inspected by Dr. William Van Arsdell, a mechanical engineer specializing in automotive restraint design and performance, on May 7, 2018. <u>Exhibit 11</u>, Van Arsdell Aff, Exhibit A, p. 6.
**RESPONSE:** <u>Neither admit nor deny.</u>

**20.** Dr. Van Arsdell confirmed that the **physical evidence on the driver's seatbelt** demonstrates that it was not being worn at the time of the accident. <u>Exhibit 11</u>, Van Arsdell Aff., Exhibit A, p. 6, 25.

**RESPONSE:** Deny, this is disputed and Van Arsdell may have given an opinion, but cannot confirm. Physical evidence is the physical evidence. Dr/ Van Arsdell makes his living testifying for defendant auto manufacturers and can put whatever spin he wants, but his spin or opinions are not facts. Dr. Van Arsdell's deposition testimony is suspect, for example, Van Arsdell ignored or dismisses contrary evidence such as the GPS, such as the police officer claiming the front airbag deployed, and when asked about the Williams case could not recall and could not recall if he was involved in a Beasley Allen false latch case.

21. The 2016 Tacoma was inspected by Dr. Elizabeth Raphael, an engineer and medical doctor specializing in vehicle occupant kinematics, on July 3, 2018. Dr. Raphael reviewed Mr. Kashper's medical records, the Medical Examiner's report, and photographs of Mr. Kashper taken by the Medical Examiner and confirmed that Mr. Kashper did not have marks on his body consistent with seatbelt usage during the accident. Affidavit of Elizabeth Raphael, Exhibit A, p. 8-10 (attached as Exhibit 12).

**RESPONSE:** Deny in that Dr. Raphael can give an opinion but use of the word deny is misleading and unwarranted. Gerald Feigin, MD, Medical examiner in affidavit and deposition testimony has stated there is a mark that suggests seatbelt use.

22. The EDR data confirms that Mr. Kashper was not wearing his seatbelt at the time of the accident. Exhibit 3, Dzivasen Depo., p. 110:22-111:6; Exhibit 11, Van Arsdell Aff., Exhibit A, p. 3, 5, 25.

**RESPONSE:** Deny, EDR data in general is suspect for validity and for reliability and is insufficient in of itself, see exhibits 2-5 of Van Arsdell dep. Also, in this case are

significant differences between the GPS data and the EDR, and also between the physical
evidence such as airbag and EDR.

Here as in Babcock there are witnesses to the seat belt use:

```
                Deposition of Anna Kashper pages 59-64
                             page59
12    Q. Did he typically wear his seatbelt when
13    you were with him?
14    A. Yes.
15    Q. Would he always wear his seatbelt?
16    A. Yes.
17    Q. Do you have a recollection of ever seeing
18    him not put on a seatbelt?
19    A. I don't.
20    Q. Do you know whether he used a seatbelt
21    while he was driving in the Tacoma?
22    A. I don't know.
23    Q. Did you and he ever talk about it?
24    A. No.
                              60
1     Q. Did you and he ever talk about seatbelt
2     use generally?
3     A. Not that I recall that we would have a
4     specific conversation.

ANNA V. KASHPER, DEPOSITION OF - Vol. 1, (Pages 63:4 to 64:16)
                              63
4     Q. The third paragraph of that response, it
5     reads, "Konstantin Kashper was, if anything,
6     fanatical about seatbelt use." Is that your writing?
7     Did you draft that answer?
8     A. It is what I said to my attorney.
9     Q. So you used that language that he was
10    fanatical about seatbelt use?
11    A. Uh-huh.
12    MR. ALPERT: I'll caution the witness.
13    The witness blurted out the answer, but that's not a
14    waiver of any attorney-client claims in this case.
15    In the future please do not refer directly or
16    indirectly -- I know it's difficult to be a
17    witness -- to attorney-client conversations. I don't
18    want to get into an inadvertent waiver of the
19    privilege.
20    THE WITNESS: Okay.
21    Q. You said it's your testimony that
22    Mr. Kashper was fanatical about seatbelt use; is that
23    correct?
```

```
24   A. Correct.
                        64
 1   Q. What is the basis for describing it in
 2   that way?
 3   A. He always used it, a seatbelt, ever since
 4   I've known him.  He also had a very high respect for
 5   vehicles, and that's -- I mean, that's where I get it
 6   from.
 7   Q. Aside from always using a seatbelt based
 8   on your observations over the years, I believe your
 9   testimony earlier was that you and he never had a
10   specific discussion about seatbelt use or anything;
11   correct?
12   A. Correct.
13   Q. So aside from your observations of him
14   using a seatbelt, is there any other information you
15   have concerning his seatbelt use?
16   A. No.
```

**Affidavit of Konstantin Vaysband:**

My name is Konstantin Vaysband. Anna Kashper is my sister. Konstantin Kashper was my brother-in-law. I have been in a moving motor vehicle many times in which Konstantin Kashper was either a passenger of the driver. The last time Konstantin Kashper and I were in a motor vehicle together was about a month or so before Konstantin Kashper died. Konstantin Kashper always, absolutely always, wore a seatbelt.

**Affidavit of Slava Glikberg:**

My name is Slava Glikberg. Konstantin Kashper and I were best friends in high school and into adult hood. I have been countless times in a moving motor vehicle in which Konstantin was either the driver or a passenger. The last time we were in a motor vehicle together was a few years before Konstantin's death. Konstantin Kashper always, absolutely always, wore a seatbelt.

**Affidavit of Leon Bouriev:**

My name is Leon Bouriev. Konstantin Kashper and I were friends since about 1995 until his death in January 2017. We have been good friends since high school. From about 1995 to sometime in January 2017, I have been on average at

least once a week in a moving motor vehicle in which Konstantin was either the
driver or a passenger. The last time was about the week before Konstantin
Kashper's death when we went together to a car show. Konstantin Kashper
always, absolutely always, wore a seatbelt. His wife's Anna's description of
Konstantin Kashper being a fanatic about wearing seatbelts is correct.

**Dr. Gerald Feigin:** testified at his deposition that marks on Konstantin's body are
suggestive of seat belt use.

23. There is no evidence that the driver's seatbelt was falsely latched at the time of the accident.
Exhibit 11, Van Arsdell Aff., Exhibit A, p. 7-13; Exhibit 12, Raphael Aff., Exhibit A, p. 9-11.
**RESPONSE:** Deny, three witnesses have either testified at deposition or by affidavit that
Konstantin Kashper always wore his seatbelt (habit). Also, Toyota's own expert William Van
Arsdell has testified that the Toyota Tacoma had a chime and also a light that alerted a driver
when the seat belt was unbuckled, but that the chime and light would go off before the belt
was actually fully buckled, thus a driver such as  Konstantin Kashper could easily have
thought seatbelt buckled when it was not.

24. The design of the driver's seatbelt in the Tacoma is inherently resistant to partial engagement,
and if partial engagement had somehow been achieved by Mr. Kashper the EDR would have
indicated that he was buckled. Exhibit 11, Van Arsdell Aff., Exhibit A, p. 7.
**RESPONSE:** Source of this is William Van Arsdell who basically earns his living testifying
for automobile manufacturers. Deny Van Arsdell's work is valid or reliable. Also deny EDR
is infallible, The term resistant to partial engagement is meaningless, and in deposition Van
Arsdell contradicted himself.

25. The only likely explanation for the accident is that Mr. Kashper experienced a medical event

that caused him to lose control of the vehicle and go off the road. Exhibit 3, Dzivasen Depo.,

p. 97:5-16; Exhibit 2, Tandy Aff., Exhibit A, p. 3; Exhibit 12, Raphael Aff., Exhibit A, p. 16.

**RESPONSE:** Deny, This is argument and not fact. The Commonwealth's medical examiner

at his deposition dismissed this explanation and the likelihood of a medical event. The GPS

data refutes this theory entirely.  Not relevant to any issue in this summary judgment motion.


26. The 2016 Tacoma was inspected by Donald F. Tandy, Jr., a mechanical engineer specializing

in accident reconstruction, on July 10, 2018. Mr. Tandy confirmed that there is no evidence

that there was an oil leak in the rear differential of the 2016 Tacoma. Mr. Tandy further

confirmed that there is no evidence that the rear differential seized prior to the accident.

Exhibit 2, Tandy Aff., Exhibit A, p. 2-3, 7.

**RESPONSE:**


27. The 2016 Tacoma was in compliance with all applicable safety standards, including all

Federal Motor Vehicle Safety Standards. Exhibit 2, Tandy Aff., Exhibit A, p. 56; Exhibit 11,

Van Arsdell Aff., Exhibit A, p. 16-18, 24, 26.

**RESPONSE:** Deny. If there was false latch or partial engagement by definition there was

non-compliance. Similarly, if there was inertial release on rollover by definition there was

noncompliance.

By definition if Konstantin Kashper buckled his seat belt and/or reasonably thought the seat

belt was fully buckled or latched, Toyota would not be in compliance with the FMVSS and

industry standards.

The following is from the deposition of Toyota's expert William Van Arsdell:

```
6. Van Arsdell deposition" 20181008wv - Vol. I, (Page
51:2 to 51:4)

                         51
  2    If a seat belt is used properly, the intent is
  3    for it to remain latched and restrain the
  4    occupant.

7. Van Arsdell deposition:
20181008wv - Vol. I, (Page 51:16 to 51:19)

                         51
  16    But I agree that seat belts to be sold
  17    in the United States and to be viewed as safe
  18    must have seat belts that comply with the
  19    Federal Motor Vehicle Safety Standards.

8. Van Arsdell deposition:
20181008wv - Vol. I, (Pages 53:1 to 59:24)

                         53
  1    Vehicle Safety Standards.
  2    Q. I will read something, which I think is a ECE
  3    regulation, Regulation No. 6.1.2.
  4    "The belt or the restraint system shall
  5    be so designed and constructed that, when
  6    correctly installed and properly used by an
  7    occupant, its satisfactory operation is assured
  8    and it reduces the risk of bodily injury in the
  9    event of an accident." End quote.
  10    Is this a standard or regulation that
  11    you ever heard of before?
  12    A. That sounds like it's language perhaps from
         ECE.
  13    R.16.
  14    Q. That's correct, yes.
  15    Is this something you agree with?
  16    A. In principle, yes. We could argue about
  17    individual words, but I think that the
  18    intentions of that statement are appropriate and
  19    I agree with it.
  20    Q. Are there any applicable American rules or
  21    regulations or standards of similar import?
  22    A. Yes.
  23    Q. What are those?
```

24    A. Well, there are a whole number of Federal
      Motor

                              54
1     Vehicle Safety Standards. The ones that are
2     directly applicable to the seat belt are FMVSS
3     208, 209, 210, and to an extent you could go
4     beyond that with some of the other crash
5     requirements, but for the most part, it's 208,
6     209 and 210.
7     Q. Now, I will go further on. This is also part
      of
8     Regulation Number 16.
9     "6.2.2.1 Buckle. The buckle shall be so
10    designed as to preclude any possibility of
11    incorrect use."
12    Is that something you ever heard before?
13    A. Yes.
14    Q. Is it something you agree with?
15    A. In general. The distinction here is that when
16    you use words like "any," we really could spend
17    hours talking about it. "Preclude any misuse,"
18    I mean, that's not practical. If somebody
19    wanted to take a seat belt buckle and pour a cup
20    of hot fudge sauce down there and then sprinkle
21    sand in there, the seat belt might not work
22    anymore. So we have to be clear about what we
23    mean.
24    Q. Is there any reason to think that Konstantin

                              55
1     Kashper did any of those things, sprinkle sand
2     or anything else?
3     A. No, but I've seen children do similar things,
4     but I don't think that he did that.
5     Q. Is there any evidence indicating that he might
6     have done something like that?
7     A. No. In fact, as I said in my report and I have
8     said multiple times today, I evaluated the
9     performance of his seat belt buckle, I looked at
10    it very carefully, including macro photographs
11    with a high quality camera. I saw no indication
12    of any foreign material in the buckle that would
13    have compromised its function, and the buckle
14    functioned fine without any propensity to false
15    latch.
16    Q. Now, also same regulation, No. 16, 6.1.2.
17    Quote, "The belt or the restraint system shall
18    be so designed and constructed that, when
19    correctly installed and properly used by an
20    occupant, its satisfactory operation is assured

```
21    and it reduces the risk of bodily injury in the
22    event of an accident." End quote.
23    Is that something you agree with?
24    A. I do. I think we would, again, have to talk

                            56
1     about assured. In the United States we use
2     language along the lines of reasonably
3     foreseeable and we do want to ensure -- assure
4     proper function of these buckles and seat belts
5     under reasonably foreseeable conditions. And
6     that's essentially what the Europeans are saying
7     in ECE R.16 and I agree with that.
8     Q. Do you know if we have any regulations that
      say
9     exactly the same thing, maybe in different
10    words?
11    A. They don't say exactly the same thing, but
      they
12    say similar things and, perhaps, one of the best
13    references related to that is one of the
14    earliest documents that was produced in 1966
15    when our country was just putting formal federal
16    regulations into place and they outlined what
17    their objective is in developing these criteria.
18    I think that's probably one of the best sources
19    to address that issue.
```

**28.** As designed and manufactured, the 2016 Tacoma was reasonably safe for its intended and

foreseeable uses as it was designed, manufactured, and sold at the time of the accident. It was

not unreasonably dangerous or defective. Exhibit 2, Tandy Aff., Exhibit A, p. 5-6; Exhibit 11,

Van Arsdell Aff., Exhibit A, p. 16-18, 24, 26.

**RESPONSE:** Deny. By definition if Konstantin Kashper buckled his seat belt and/or

reasonably thought the seat belt was fully buckled or latched, Toyota would not be in

compliance with the FMVSS and industry standards.

The following is from the deposition of Toyota's expert William Van Arsdell:

```
6. Van Arsdell deposition" 20181008wv - Vol. I, (Page
51:2 to 51:4)
```

                              51
2      If a seat belt is used properly, the intent is
3      for it to remain latched and restrain the
4      occupant.
7. Van Arsdell deposition:
20181008wv - Vol. I, (Page 51:16 to 51:19)


                              52
16     But I agree that seat belts to be sold
17     in the United States and to be viewed as safe
18     must have seat belts that comply with the
19     Federal Motor Vehicle Safety Standards.

8. Van Arsdell deposition"
20181008wv - Vol. I, (Pages 53:1 to 59:24)

                              53
1      Vehicle Safety Standards.
2      Q. I will read something, which I think is a ECE
3      regulation, Regulation No. 6.1.2.
4      "The belt or the restraint system shall
5      be so designed and constructed that, when
6      correctly installed and properly used by an
7      occupant, its satisfactory operation is assured
8      and it reduces the risk of bodily injury in the
9      event of an accident."  End quote.
10     Is this a standard or regulation that
11     you ever heard of before?
12     A. That sounds like it's language perhaps from
       ECE.
13     R.16.
14     Q. That's correct, yes.
15     Is this something you agree with?
16     A. In principle, yes. We could argue about
17     individual words, but I think that the
18     intentions of that statement are appropriate and
19     I agree with it.
20     Q. Are there any applicable American rules or
21     regulations or standards of similar import?
22     A. Yes.
23     Q. What are those?
24     A. Well, there are a whole number of Federal
       Motor

                              54
1      Vehicle Safety Standards. The ones that are
2      directly applicable to the seat belt are FMVSS
3      208, 209, 210, and to an extent you could go
4      beyond that with some of the other crash
5      requirements, but for the most part, it's 208,

6    209 and 210.
7    Q. Now, I will go further on. This is also part
     of
8    Regulation Number 16.
9    "6.2.2.1 Buckle. The buckle shall be so
10   designed as to preclude any possibility of
11   incorrect use."
12   Is that something you ever heard before?
13   A. Yes.
14   Q. Is it something you agree with?
15   A. In general. The distinction here is that when
16   you use words like "any," we really could spend
17   hours talking about it. "Preclude any misuse,"
18   I mean, that's not practical. If somebody
19   wanted to take a seat belt buckle and pour a cup
20   of hot fudge sauce down there and then sprinkle
21   sand in there, the seat belt might not work
22   anymore. So we have to be clear about what we
23   mean.
24   Q. Is there any reason to think that Konstantin

                          55
1    Kashper did any of those things, sprinkle sand
2    or anything else?
3    A. No, but I've seen children do similar things,
4    but I don't think that he did that.
5    Q. Is there any evidence indicating that he might
6    have done something like that?
7    A No. In fact, as I said in my report and I have
8    said multiple times today, I evaluated the
9    performance of his seat belt buckle, I looked at
10   it very carefully, including macro photographs
11   with a high quality camera. I saw no indication
12   of any foreign material in the buckle that would
13   have compromised its function, and the buckle
14   functioned fine without any propensity to false
15   latch.
16   Q. Now, also same regulation, No. 16, 6.1.2.
17   Quote, "The belt or the restraint system shall
18   be so designed and constructed that, when
19   correctly installed and properly used by an
20   occupant, its satisfactory operation is assured
21   and it reduces the risk of bodily injury in the
22   event of an accident." End quote.
23   Is that something you agree with?
24   A. I do. I think we would, again, have to talk

                          56
1    about assured. In the United States we use
2    language along the lines of reasonably
3    foreseeable and we do want to ensure -- assure

```
4       proper function of these buckles and seat belts
5       under reasonably foreseeable conditions. And
6       that's essentially what the Europeans are saying
7       in ECE R.16 and I agree with that.
8       Q. Do you know if we have any regulations that
        say
9       exactly the same thing, maybe in different
10      words?
11      A. They don't say exactly the same thing, but
        they
12      say similar things and, perhaps, one of the best
13      references related to that is one of the
14      earliest documents that was produced in 1966
15      when our country was just putting formal federal
16      regulations into place and they outlined what
17      their objective is in developing these criteria.
18      I think that's probably one of the best sources
19      to address that issue.
```

**29.** There is no evidence of negligence or breach of warranty on the part of TMS.

Exhibit 2, Tandy Aff., Exhibit A, p. 3; Exhibit 3, Dzivasen Depo., p. 42:22- 43:10,

120:13-123:2; Exhibit 11, Van Arsdell Aff., Exhibit A, p. 16-18, 24, 26.

**RESPONSE:** Deny: By definition if Konstantin Kashper buckled his seat belt and/or

reasonably thought the seat belt was fully buckled or latched, Toyota would not be in

compliance with the FMVSS and industry standards.

The following is from the deposition of Toyota's expert William Van Arsdell:

```
6. Van Arsdell deposition" 20181008wv - Vol. I, (Page
51:2 to 51:4)

                        51
2       If a seat belt is used properly, the intent is
3       for it to remain latched and restrain the
4       occupant.

7. Van Arsdell deposition:
20181008wv - Vol. I, (Page 51:16 to 51:19)

                        52
16      But I agree that seat belts to be sold
17      in the United States and to be viewed as safe
```

18    must have seat belts that comply with the
19    Federal Motor Vehicle Safety Standards.

8. Van Arsdell deposition"
20181008wv - Vol. I, (Pages 53:1 to 59:24)

                        53
1     Vehicle Safety Standards.
2     Q. I will read something, which I think is a ECE
3     regulation, Regulation No. 6.1.2.
4     "The belt or the restraint system shall
5     be so designed and constructed that, when
6     correctly installed and properly used by an
7     occupant, its satisfactory operation is assured
8     and it reduces the risk of bodily injury in the
9     event of an accident."  End quote.
10    Is this a standard or regulation that
11    you ever heard of before?
12    A. That sounds like it's language perhaps from
      ECE.
13    R.16.
14    Q. That's correct, yes.
15    Is this something you agree with?
16    A. In principle, yes. We could argue about
17    individual words, but I think that the
18    intentions of that statement are appropriate and
19    I agree with it.
20    Q. Are there any applicable American rules or
21    regulations or standards of similar import?
22    A. Yes.
23    Q. What are those?
24    A. Well, there are a whole number of Federal
      Motor

                        54
1     Vehicle Safety Standards. The ones that are
2     directly applicable to the seat belt are FMVSS
3     208, 209, 210, and to an extent you could go
4     beyond that with some of the other crash
5     requirements, but for the most part, it's 208,
6     209 and 210.
7     Q. Now, I will go further on. This is also part
      of
8     Regulation Number 16.
9     "6.2.2.1 Buckle. The buckle shall be so
10    designed as to preclude any possibility of
11    incorrect use."
12    Is that something you ever heard before?
13    A. Yes.
14    Q. Is it something you agree with?
15    A. In general. The distinction here is that when

16    you use words like "any," we really could spend
17    hours talking about it. "Preclude any misuse,"
18    I mean, that's not practical. If somebody
19    wanted to take a seat belt buckle and pour a cup
20    of hot fudge sauce down there and then sprinkle
21    sand in there, the seat belt might not work
22    anymore. So we have to be clear about what we
23    mean.
24    Q. Is there any reason to think that Konstantin

55

1    Kashper did any of those things, sprinkle sand
2    or anything else?
3    A. No, but I've seen children do similar things,
4    but I don't think that he did that.
5    Q. Is there any evidence indicating that he might
6    have done something like that?
7    A No. In fact, as I said in my report and I have
8    said multiple times today, I evaluated the
9    performance of his seat belt buckle, I looked at
10    it very carefully, including macro photographs
11    with a high quality camera. I saw no indication
12    of any foreign material in the buckle that would
13    have compromised its function, and the buckle
14    functioned fine without any propensity to false
15    latch.
16    Q. Now, also same regulation, No. 16, 6.1.2.
17    Quote, "The belt or the restraint system shall
18    be so designed and constructed that, when
19    correctly installed and properly used by an
20    occupant, its satisfactory operation is assured
21    and it reduces the risk of bodily injury in the
22    event of an accident." End quote.
23    Is that something you agree with?
24    A. I do. I think we would, again, have to talk

56

1    about assured. In the United States we use
2    language along the lines of reasonably
3    foreseeable and we do want to ensure -- assure
4    proper function of these buckles and seat belts
5    under reasonably foreseeable conditions. And
6    that's essentially what the Europeans are saying
7    in ECE R.16 and I agree with that.
8    Q. Do you know if we have any regulations that
         say
9    exactly the same thing, maybe in different
10    words?
11    A. They don't say exactly the same thing, but
         they
12    say similar things and, perhaps, one of the best

```
13    references related to that is one of the
14    earliest documents that was produced in 1966
15    when our country was just putting formal federal
16    regulations into place and they outlined what
17    their objective is in developing these criteria.
18    I think that's probably one of the best sources
19    to address that issue.
```

30.   There is no evidence that the Tacoma caused Mr. Kashper's death. Exhibit 2, Tandy Aff.,

Exhibit A, p. 3; Exhibit 3, Dzivasen Depo., p. 42:22- 43:10, 120:13-123:2. Failure of the

seat belt to restrain Konstantin Kashper is the proximate cause of Konstantin Kashper's

death.


**Affidavit of Medical/Expert Grace Perez Lirio:**

My name is Grace Perez Lirio, M.D. My C.V. is attached hereto. I have never been

deposed or testified as an expert medical witness. I was asked to review the case of a

rollover crash that involved Konstantin Kashper on January 26, 2017 and to address the

question of whether the decedent would have survived if he had been securely belted

during the time of the accident.


**CASE MATERIALS PROVIDED TO ME:**

**Medicar/020Examiner_e/020Repore/020000001-000049.pdf**

12118K

**ExtractPagel.pdf**

1262K

**RICHARD J. EVANS, M.D., DEPOSITION OF - Vol.pdf**

133K

**MATTHEW KELLY - FULL - 040618.pdf**

194K

**McDonald 20180530sm.pdf**

383K

**2017-car-000033 final_Redacted.pdf**

625K

Resources I found helpful:

Am J Forensic Med Pathol Positional Asphyxia: Death Due to Unusual Head-Down Position in a

Narrow Space by Chaudhari VA1, Ghodake DG, Kharat RD.

Am J Forensic Med Pathol. 2007 Dec;28(4):330-2. Fatal positional asphyxia associated with rollover crashes. Conroy Cl, Eastman AB, Stanley C, Vilke GM. Vaughan T. Hoyt DB, Pacyna S.

Arch Med Sadowej Kryminol. 2004 Apr-Sep:54(2-3):163-8. Positional asphyxia as a cause of

death in a traffic accident with the driver in the "upside-down car position" Jankowski

Z1, Wilmanowska A, Piegniak D, Kubiak A.


In review of the hospital records, photos and the testimonies by the medical examiner and the emergency responder, I agree that Mr. Kashper's death most likely resulted from positional and postural asphyxia.

Konstantin Kashper was found rolled and curled over, upside down with his head against the roof of an overturned vehicle. The mechanical obstruction caused by cervical flexion compromised his airway, breathing and circulation. The distribution of the petechiae and bruise around his neck and sub conjunctival hemorrhage confirm vascular congestion resulting from impedance of venous return seen in asphyxiation.

My opinions with reasonable medical and scientific certainty include:

1) Konstantin Kashper was alive prior to his vehicle contacting the rock wall. There would not have been petechiae and bruise if Mr. Kashper had predeceased.

2) It is more likely than not that if Konstantin Kashper had been securely restrained with a seatbelt, Konstantin Kashper would have survived the event of January 26, 2017. The seatbelt would have prevented/eliminated Kashper's body from going into cervical flexion and allowed his airways to remain patent.

3) The medical literature and consensus is that someone injured such as Konstantin Kashper would have six minutes before anoxic brain damage ensues and eventual cessation of all bodily function leading to death.

Signed under the pains and penalties of perjury this 6th day of August 2018. Grace Perez-Lirio, MD

**TOYOTA MOTOR SALES, U.S.A., INC**

By its Attorneys,

CAMPBELL CAMPBELL EDWARDS & CONROY, P.C.

/s/ *David M. Rogers*
James M. Campbell (BBO #541882) David M. Rogers (BBO #542233)
Jacob J. Lantry (BBO #690452)
1 Constitution Wharf, Suite 310
Boston, MA 02129
Tel:   (617) 241-3000
Fax:   (617) 241-5115
jmcampbell@campbell-trial-lawyers.com
drogers@campbell-trial-lawyers.com
jlantry@campbell-trial-lawyers.com

Kashper plaintiffs by their attorney,

Marc S Alpert, BBO#016420
Marc S Alpert, P.C.
15 Court Square, #940
Boston, MA 02108-2524
Tel: 617 227-2380, Fax: 866-393-2857

Certificate of service: I certify that in addition to the
automatic service on all those who have filed an appearance, a
copy of this is being e-mailed to David M. Rogers.